Condor Merritt v. Commissioner.
Merritt v. Commissioner
Docket No. 45707.
United States Tax Court
T.C. Memo 1959-172; 1959 Tax Ct. Memo LEXIS 81; 18 T.C.M. (CCH) 745; T.C.M. (RIA) 59172; August 28, 1959
*81 Held, the evidence reviewed and the respondent's computation under the net worth method of petitioner's unreported net income was correct, with adjustments made as to several of the disputed items; held, further, a part of the deficiencies for each of the years 1943 through 1949 was due to fraud with intent to evade tax; and held, further, the returns filed by the petitioner, individually, in 1944 and 1946, and jointly with his wife for the years 1943 and 1945, were false or fraudulent returns with intent to evade tax. Robert G. Murrell, Esq., for the petitioner. W. Preston White, Jr., Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: Respondent determined the following deficiencies and *82 additions to tax: Additions to
Tax under
Section 293(b)
Year
Deficiency
I.R.C. of 1939
1943
$ 2,024.38
$1,012.19
1944
2,798.34
1,399.17
1945
7,559.79
3,779.89
1946
6,344.06
3,172.03
1947
15,079.64
7,539.82
1948
7,931.60
3,965.80
1949
2,255.40
1,127.70 In an amended answer the respondent claimed an increased addition to tax under section 293(b) of the Internal Revenue Code of 1939[1] in the amount of $545.44 for the year 1943. This amendment merely corrected a mathematical error made by respondent in his statutory notice of deficiency, which is admitted. The issues are: (1) Whether the petitioner understated his income for each of the years 1943 through 1949; (2) Whether a part of the deficiency for each of the years 1943 through 1949 was due to fraud with intent to evade tax; and (3) Whether the years 1943 through 1946 are barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated and they are hereby incorporated by this reference. Condor Merritt, hereinafter called the petitioner, is a resident of Altamonte *83 Springs, Florida. He filed individual income tax returns for the years 1944, 1946 and 1947 with the then collector of internal revenue for the district of Florida. Petitioner and his wife, Mary, filed joint income tax returns for the years 1943, 1945, 1948 and 1949 with the then collector of internal revenue for the district of Florida. Petitioner reached the seventh grade in school. From 1926 to about 1936 the petitioner was a grove hand earning approximately $25 a week. He also worked as a carpenter and constructed some houses (less than a dozen) on which he made profits of from $50 to $100 each. In 1936 he went into the beer garden business and he also did a small amount of bootlegging. Prior to 1943 the petitioner filed only one income tax return. At various times during the years here involved the petitioner was engaged in the grocery business, theatre business, beauty parlor business, cafe business, poolroom business, package liquor store business, gambling and game machine business, bar business, night club business, and the illegal bolita and Cuba gambling business. He also derived income during these years from rents and from the construction and sale of houses. About *84 1943 the petitioner entered the illegal gambling business and also in that year he began to buy land and to clear it for citrus groves. In 1944 he obtained a liquor license from the State of Florida and went into the liquor business. In 1945 he erected a building and opened a theatre. In 1946 he purchased a building in Orlando, Florida, for approximately $27,000. He improved the building, enlarged a poolroom located in the building and opened a beauty shop in the building. The beauty shop was soon closed and the space was rented to a doctor. Also in 1946 he opened a rooming house. In 1947 he contracted to have his citrus groves cultivated and fertilized. In 1948 the petitioner sold his grocery store inventory to his brother-in-law, built a new night club, and also went into the illegal Cuba lottery business. About the year 1945 the petitioner engaged Barney J. Cohen, a public bookkeeper, to maintain certain business records for him. These records were kept from summary information submitted by the petitioner. Prior to this time petitioner did not have a formal set of accounting records. There were almost no records for the years 1942 through 1944 and no basis for verification of *85 most of the figures appearing in the records. There were no cash register tapes. The books showed a great many checks drawn to cash and many without any notation as to purpose. The books indicated that the total receipts of petitioner's businesses were not deposited in the bank and the records of petitioner's gambling businesses were incomplete and were available for only a part of the years involved. The books and records afforded no basis for verification of the amounts shown in petitioner's income tax returns for the years in question. Respondent, by using the net worth and expenditures method, originally computed the petitioner's unreported net income for the years 1943 through 1949 as follows: Understate-
Net Income
Computed Net
ment of
Year
Reported
Income
Net Income
1943
$ 999.75
$12,754.33
$11,754.88
1944
10,355.81
16,577.73
6,221.92
1945
23,616.38
34,715.33
11,098.95
1946
32,689.79
41,500.90
8,811.11
1947
8,928.88
38,305.30
29,376.42
1948
8,193.64
33,748.89
25,555.25
1949
4,526.16
15,587.66
11,061.50 Subsequent to the trial, and as a result of concessions and adjustments there made, the respondent prepared *86 the following net worth computation: At the end of each of the years 1942 to 1949, inclusive, the petitioner had assets and liabilities at least as follows: ASSETS
1942
1943
1944
1945
Cash in Banks: Florida State Bank, Sanford,
$ 700.23
$ 2,710.15
Florida
First National Bank, Orlando,
Florida
Florida Bank and Tr. Co.,
Winter Park, Florida
Personal Account
$ 1,022.83
1,233.94
1,222.29
Store Account
0
1,457.60
3,564.53
Bonds
$ 37.50
318.75
881.25
1,200.00
Inventories
135.00
300.00
3,857.93
8,482.09
Investments in Businesses: Club Surrocco
United Progressive
Cooperative
Real Estate: Seminole County, Florida
775.00
1,423.00
1,734.50
2,524.50
Orange County, Florida
Citrus Groves
1,445.50
4,241.01
Buildings Constructed and
5,275.00
6,775.00
10,192.80
19,902.00
Purchased
Furniture, Fixtures,
1,850.00
1,850.00
2,996.40
6,262.77
Equipment
Motor Vehicles: 1940 Ford
675.00
675.00
675.00
675.00
1946 Dodge
1947 DeSoto
1948 DeSoto
1 1/2 Ton G.M.C. Truck
1949 Buick
Mercury Station Wagon
Down Payment on Land
Accounts Receivable
Loans Receivable
700.00
Prepaid Insurance: Westchester
Fulton
Birmingham
TOTAL ASSETS
$ 8,747.50
$ 12,364.58
$ 25,175.15
$ 51,484.34
LIABILITIES
LIABILITIES
Accounts Payable
0
$ 25.00
$ 25.00
$ 111.25
Notes Payable: Florida Bank & Trust Company,
Winter Park, Fla.
Florida Bank & Trust Company,
Winter Park, Fla.
Florida Bank & Trust Company,
Winter Park, Fla.
Florida Bank at Orlando, Fla.
(Prepaid Insurance)
Mortgages Payable: Paul Herman
Property, Orange County,
Florida
Florida Bank & Trust Company,
Winter Park, Fla.
Retained Title Contracts: Car Note - G.M.A.C.
Car Note - Associates
Discount Corp.
Citizens National Bank,
Orlando, Florida
First National Bank
Reserves for Depreciation: Buildings
$ 580.94
857.19
1,258.92
1,896.54
Equipment
164.58
349.58
582.34
1,134.51
Motor Vehicles
270.00
405.00
540.00
675.00
TOTAL LIABILITIES
$ 1,015.52
$ 1,636.77
$ 2,406.26
$ 3,817.30
*87 ASSETS
1946
1947
1948
1949
Cash in Banks: Florida State Bank, Sanford,
$ 437.27
$ 202.82
$ 89.92
$ 89.92
Florida
First National Bank, Orlando,
863.31
100.71
19.47
74.14
Florida
Florida Bank and Tr. Co.,
Winter Park, Florida
Personal Account
1,046.23
3,537.99
3,104.60
490.43
Store Account
1.53
1.53
3,354.51
129.83
Bonds
1,331.25
Inventories
12,768.97
5,870.78
4,650.48
6,430.84
Investments in Businesses: Club Surrocco
1,000.00
United Progressive
280.00
Cooperative
Real Estate: Seminole County, Florida
4,594.50
6,082.50
5,855.84
7,792.88
Orange County, Florida
1,550.00
1,790.00
Citrus Groves
9,919.23
14,407.47
17,817.72
22,200.68
Buildings Constructed and
60,519.22
87,325.45
110,988.86
121,968.09
Purchased
Furniture, Fixtures,
9,941.28
12,684.18
19,847.64
22,481.86
Equipment
Motor Vehicles: 1940 Ford
1946 Dodge
1,700.00
1947 DeSoto
1,975.00
1948 DeSoto
2,180.84
2,180.84
1 1/2 Ton G.M.C. Truck
1,535.00
1,535.00
1949 Buick
3,120.66
Mercury Station Wagon
3,430.34
Down Payment on Land
800.00
Accounts Receivable
3,667.00
1,825.00
924.00
Loans Receivable
700.00
700.00
700.00
700.00
Prepaid Insurance: Westchester
789.23
602.63
Fulton
489.85
Birmingham
887.18
TOTAL ASSETS
$103,822.79
$136,555.43
$174,309.11
$199,399.17
LIABILITIES
Accounts Payable
$ 1,235.79
$ 2,338.32
$ 8,853.81
$11,899.75
Notes Payable: Florida Bank & Trust Company,
4,000.00
Winter Park, Fla.
Florida Bank & Trust Company,
2,000.00
Winter Park, Fla.
Florida Bank & Trust Company,
3,000.00
Winter Park, Fla.
Florida Bank at Orlando, Fla.
770.48
1,823.44
(Prepaid Insurance)
Mortgages Payable: Paul Herman
1,000.00
700.00
Property, Orange County,
20,000.00
16,000.00
12,000.00
8,000.00
Florida
Florida Bank & Trust Company,
5,000.00
Winter Park, Fla.
Retained Title Contracts: Car Note - G.M.A.C.
1,381.44
Car Note - Associates
1,936.29
Discount Corp.
Citizens National Bank,
829.35
Orlando, Florida
First National Bank
522.00
Reserves for Depreciation: Buildings
3,799.42
6,375.31
9,477.60
13,956.24
Equipment
2,029.44
4,098.55
6,220.46
9,332.40
Motor Vehicles
35.41
41.19
791.56
2,602.92
TOTAL LIABILITIES
$28,100.06
$33,553.37
$43,113.91
$57,283.83
*88 For each of the years 1942 to 1949, inclusive, the petitioner's net worth, net worth increases, non-deductible personal expenses, deductible items, taxable income, and understatements of taxable income on his Federal income tax returns were at least as follows: 1942
1943
1944
1945
Assets
$ 8,747.50
$ 12,364.58
$ 25,175.15
$ 51,484.34
Liabilities
1,015.52
1,636.77
2,406.26
3,817.30
Net Worth
$ 7,731.98
$ 10,727.81
$ 22,768.89
$ 47,667.04
Net Worth Preceding Year
7,731.98
10,727.81
22,768.89
Net Worth Increase
$ 2,995.83
$ 12,041.08
$ 24,898.15
Add: Living Expenses
4,800.00
4,800.00
4,800.00
Deductible Non-Business
Expenses
Income Tax Payments
51.00
12.00
3,750.52
Purchase of Annuity
3,250.00
$ 7,846.83
$ 16,853.08
$ 36,698.67
Less: Non-Taxable Portion Capital
0
275.00
0
Gain
Non-Taxable Portion Annuity
15.88
Payment
Sale of Real Estate to Lula
Cook
Income Reported by
Petitioner's Wife
$ 7,846.83
$ 16,578.08
$ 36,682.79
Deductions
500.00
500.00
Net Income
$ 7,846.83
$ 16,078.08
$ 36,182.79
Net Income Reported
999.75
10,355.81
23,616.38
Understatement of Income
$ 6,847.08
$ 5,722.27
$ 12,566.41
*89 1946
1947
1948
1949
Assets
$103,822.79
$136,555.43
$174,309.11
$199,399.17
Liabilities
28,100.06
33,553.37
43,113.91
57,283.83
Net Worth
$ 75,722.73
$103,002.06
$131,195.20
$142,115.34
Net Worth Preceding Year
47,667.04
75,722.73
103,002.06
131,195.20
Net Worth Increase
$ 28,055.69
$ 27,279.33
$ 28,193.14
$ 10,920.14
Add: Living Expenses
4,800.00
4,800.00
4,800.00
4,800.00
Deductible Non-Business
555.00
1,193.85
Expenses
Income Tax Payments
9,760.93
8,181.78
174.76
1,000.00
Purchase of Annuity
$ 42,616.62
$ 40,816.11
$ 33,167.90
$ 17,913.99
Less: Non-Taxable Portion Capital
52.50
1,272.88
2,018.70
327.42
Gain
Non-Taxable Portion Annuity
23.82
23.82
23.82
23.82
Payment
Sale of Real Estate to Lula
2,700.00
Cook
Income Reported by
754.00
728.00
Petitioner's Wife
$ 41,786.30
$ 36,091.41
$ 31,125.38
$ 17,562.75
Deductions
500.00
550.00
1,000.00
1,193.85
Net Income
$ 41,286.30
$ 35,536.41
$ 30,125.38
$ 16,368.90
Net Income Reported
32,689.79
8,928.88
8,193.64
4,526.16
Understatement of Income
$ 8,596.51
$ 26,607.53
$ 21,931.74
$ 11,842.74
Petitioner, for each *90 of the taxable years in question, failed to keep or produce adequate and complete books of accounts and records of his income producing activities. A part of the deficiency for each of the years 1943 through 1949 was due to fraud with intent to evade tax. The Federal income tax returns filed by the petitioner individually in 1944 and 1946, and jointly with his wife for the years 1943 and 1945, were false or fraudulent returns with intent to evade tax. Opinion Respondent's use of the net worth method is attacked by the petitioner, who argues that the books and records maintained by him are complete and adequate on their face and, therefore, are the best evidence of his income throughout the years before us. We cannot agree. Prior to 1945 the petitioner kept no formal records and after that date he supplied information of cash receipts and disbursements to a public bookkeeper who recorded this information in a single entry system of books kept for the petitioner at the bookkeeper's office. There was no way to verify much of the information that found its way into these accounting books, and it was evident that some of the records kept, especially in regard to petitioner's gambling *91 activities, were incomplete. It was shown that as to his gambling business, petitioner merely furnished his bookkeeper with a recap sheet showing his winnings and losses, and, perhaps, commissions paid, and in some of the other businesses, such as the grocery store, the bookkeeper could not get petitioner to take an exact inventory and an estimated inventory was used. The bookkeeper testified: "But at the end of the tax year there was additional information that went on the return that was not in the books, and he [petitioner] would bring in that information or relate it to me orally." The net worth computation was, on the whole, prepared with an effort at thoroughness and fairness. Where the net worth computation shows increases in net worth greater than that reported on a taxpayer's returns, or is not consistent with his records, then the net worth computation is evidence that there is unreported income and that the records, even though seemingly complete on their face, are inadequate, inaccurate or false. Holland v. United States, 348 U.S. 121; Morris Lipsitz, 21 T.C. 917, affd. 220 Fed. (2d) 871, certiorari denied 350 U.S. 845. *92 Under the record presented respondent was clearly justified in utilizing the net worth method of computing and determining petitioner's taxable income for the years in question. Respondent produced a mass of evidence to support all the items and figures in the net worth statement. This evidence consisted of bank records, deeds, mortgages and other documents. Some items were stipulated and some were supported by data appearing in petitioner's books or income tax returns, or furnished by petitioner or his bookkeeper, or the subject of testimony consisting of prior admissions by petitioner. Petitioner's main argument is that at the trial so many of the specific items in the original net worth computation were shown to be erroneous that the entire net worth computation is thereby rendered unreliable and the determination of deficiency thereon is arbitrary. There is no question that some of the evidence produced at the trial did establish some of the figures used in the original net worth computation were not correct. Respondent admitted this and gave effect to some of this testimony, by the net worth computation submitted after trial contained in our findings of fact, reducing *93 the unreported income in five of the seven years involved. We think there should be further correction of some of the items and figures, which will have the effect of further reductions of unreported income, as will presently appear, but the fact that some of the items in the net worth computation were incorrect does not mean it should be declared unavailable or that respondent acted arbitrarily. It merely means petitioner introduced convincing evidence which, as to such items, overcame the evidence of respondent and the net worth should be adjusted to show what is admitted or determined to be correct. Petitioner argues there are a number of "errors" in respondent's schedule of net worth increases and expenditures which have the effect of overstating petitioner's taxable income. It is somewhat significant that if all of petitioner's contentions as to erroneous items in the net worth schedule were accepted, it would still show understatements of income and deficiencies in each year involved. Many of the arguments and objections made by the petitioner on brief are entirely without support in the record. In fact, as to one item, opening cash on hand as of January 1, 1943, the petitioner's *94 counsel at the trial stated there would be no contention that there was any opening cash on hand, saying "In other words, we are not going to introduce any cash hoard or anything of that sort at all." On brief, petitioner now argues there was opening cash, though he does not tell us how much. There is no evidence of cash on hand as of that date. Petitioner did not testify that there was any. Moreover, a careful analysis of the petitioner's activities for several years prior to 1943 makes it extremely unlikely that such opening cash existed. From approximately 1926 to 1936 petitioner was a grove hand earning about $25 a week. He did some carpenter work, building about a dozen houses at profits ranging from $50 to $100 a house. In 1936 he went into the beer garden business and did a small amount of bootlegging. Prior to 1943 he filed only one income tax return and this showed no taxable income. He received no gifts or inheritances prior to 1943. We think that, even apart from his own contention at the trial, it is highly unlikely that petitioner had any opening cash on hand as of January 1, 1943. We agree with the respondent as to this item. Petitioner also contends that adjustments *95 should be made, by reason of checks outstanding at the end of each year, to the amounts shown on the net worth schedule as year-end bank balances. These bank balances were stipulated and we do not think petitioner can now make an argument seeking to alter these stipulations. Moreover, we do not know the nature of these checks. If they represented payments for assets still on hand at the end of the year, the change in net worth would be unaffected, since one asset would be credited and another debited, leaving the total unchanged. If they represent payments on accounts payable, or notes payable, or on some other liability, again it would not affect the net worth since the decrease in an asset would be matched by a corresponding decrease in a liability. Even if adjustments were made, it would merely have the effect of shifting net income from one year to another. Under this record we do not think that adjustments should be made for any outstanding checks. Respondent lists among petitioner's assets in 1949 an investment of $1,000 in Club Surrocco, a package liquor store, and an investment of $280 in the United Progressive Corporation, an insurance venture. Petitioner argues that he *96 only had a 50 per cent interest in the Club and that the other 50 per cent was held by Roy Baisden. Petitioner testified that the check for $1,000, made payable to Baisden, was for [a] liquor license. All we have is petitioner's vague and uncorroborated testimony that this was a joint venture. Certainly the check made out to Baisden does not point that way. We sustain respondent on the issue. As for the $280 investment in the insurance corporation, petitioner does no more than state that the venture went out of business in 1949 shortly after the check was issued. This oral testimony is not enough to establish that the investment was, in fact, worthless in 1949. We agree with respondent that it should be included among petitioner's assets for 1949. During the years 1943 through 1949 the petitioner was active in acquiring parcels of real estate, apart from citrus groves, in Seminole County and in Orange County. On the net worth schedule the respondent listed among petitioner's assets some 37 parcels in Seminole County and 10 parcels in Orange County, using cost figures which, for the most part, were furnished by petitioner. Petitioner argues that some of the parcels were held in *97 partnership with others and that consequently only one half of the amounts shown should be included in the net worth schedule. We have examined the record carefully and cannot find evidence sufficient to support this. What little testimony there is on this point is casual and inconclusive and, we think, not worthy of belief. Petitioner also objects to the amounts attributed to several of the parcels of real estate. No purpose would be served to list them here. As to some of these parcels, the respondent has made concessions and accepted petitioner's amounts, and these concessions are incorporated in the revised net worth schedule which appears in our findings of fact. We have examined closely the real estate schedule prepared by respondent, as well as respondent's sources of such schedule, and we are persuaded that, which the concessions noted above, the schedule is correct. Petitioner argues a G.M.C. truck, which appears as an asset in the net worth schedule for 1948 and 1949, was not purchased until 1952. However, the seller of the truck appeared as a witness and testified explicitly that he sold this particular truck to petitioner in 1948. Petitioner's testimony on this point *98 involves little more than an explanation as to the transfer of title. In fact, the seller's testimony remains uncontradicted. We sustain the respondent on this item. One of the liabilities listed by respondent in the net worth schedule for the year ending December 31, 1948 was an account payable to The Southern Company in the amount of $114.93. Petitioner contends that this liability as of that date was considerably larger. To support this contention the petitioner placed into evidence an invoice from The Southern Company dated December 21, 1948, showing an amount outstanding of $776.57 and his check payable to The Southern Company, dated January 3, 1949 in the amount of $1,114.38. We think this is ample proof of petitioner's contention and we hold that the outstanding amount payable to The Southern Company as of December 31, 1948 was $1,114.38. Petitioner also objects to the McKesson & Robbins, Inc. account payable, but the record amply supports the amounts used by the respondent. The credit manager of McKesson & Robbins, Inc., testified to these amounts, basing his testimony on company records. There is nothing in the record to satisfactorily refute this evidence and we sustain *99 the respondent as to this item. Petitioner contends that the respondent erroneously failed to include among the liabilities in the net worth schedule certain loans and notes payable at the close of several of the years here involved. He contends that in 1946 he was given $3,000 by one G. P. Schanck "to keep for him" and that the petitioner gave the money back in 1947. Petitioner does not claim it was a loan. The nature of the transaction is not identified in any way; there are no written instruments bearing upon it; and Schanck was not called upon to testify. We hold for respondent on this item. Petitioner also claims a loan payable to John Henry Surles on December 31, 1949 in the amount of $2,000. Petitioner testified that he borrowed this money "some time during 1949", that a $1,500 installment was repaid to Surles in January, 1950 and that the balance was repaid later in that same year. Petitioner's testimony is supported by his check in evidence which is dated January 24, 1950, made payable to Surles in the amount of $1,500 and with the notation on it "Personal Loan $2,000.00." We think petitioner has established this particular item. Petitioner also claims a note payable to *100 the Florida State Bank in the amount of $6,000 as of December 31, 1949. Apart from a schedule attached to a letter from the petitioner's accountant to Sam Murrell, petitioner's attorney in this case, there is absolutely no testimony on this item, nor was there any effort made to introduce other evidence establishing the existence of this obligation. Since this was an alleged bank loan it would seem such evidence, if the obligation did, in fact, exist, would be readily attainable. We do not believe that a bare list of amounts prepared in this fashion, with nothing more, can be given any weight. We hold for respondent as to this purported obligation. Lastly, petitioner contends that he borrowed $5,500 from J. E. Laughinghouse in 1949 on a note, and that this entire amount was unpaid as of December 31, 1949. There is in evidence a note made out to Laughinghouse in this amount, under date of January 5, 1949, under the petitioner's signature. Laughinghouse also testified that the loan was made to petitioner in 1949 and that up to the time of the trial, although he made attempts to collect from petitioner, he had never been paid anything on the note either on the principal or by way of interest. *101 We think petitioner has established that a valid note payable in the amount of $5,500 was outstanding on December 31, 1949. We cannot say, as the respondent suggests on brief, that the absence of any interest or principal payments over the years is necessarily conclusive that the note executed by petitioner in 1949 did not create a valid debt. Laughinghouse's testimony stands uncontradicted and he was not cross-examined by respondent's counsel. Respondent included living expenses of $4,800 a year in the net worth schedule. Petitioner estimated his living expenses at $15 to $20 a week, insisting that he and his family lived simply in a small colored community without many of the modern conveniences. During the years here involved the petitioner had as many as seven dependents who were listed as such in his returns filed in those years. Also, he sent two of his children to college during this time and he stated in an affidavit that it cost about $1,600 per year to to this. There is also evidence that the petitioner's son was given a new car in 1949 to take with him to college. We have examined all the evidence on this point and are persuaded that the petitioner's annual living expenses *102 were $4,000 a year for the years involved. Respondent determined that petitioner was liable for additions to tax under section 293 (b) for all of the years involved. The cited section provides for an addition of "50 per centum of the total amount of the deficiency" if any part of any deficiency is due to fraud with intent to evade tax. The burden of proof to show fraud is on the respondent and it must be established by clear and convincing evidence. Arlette Coat Co., Inc., 14 T.C. 751. We have, with some adjustments previously noted, accepted the net worth statement of respondent, and we have pointed out that the items and figures therein were, except as to the adjusted items, established by respondent by affirmative proof, much of which is not questioned. This evidence clearly shows that petitioner grossly understated his net income for the years before us. His understatements of income were so large, so regular, and so frequent as to establish a deliberate intention to defraud the Government of the taxes lawfully due it. This course of conduct, extending over a period of seven years, of reporting only a fraction of his income from many businesses, including gambling *103 businesses, and maintaining only partial records, shows in a clear and convincing fashion that petitioner knew he was understating his income and he did it to avoid payment of the taxes which were lawfully due on that income. His keeping almost no records of his income from his many businesses for the years 1943 and 1944 and totally inadequate records for the remaining years involved is evidence that his method of keeping his books and records was designed to conceal the true facts concerning his taxable income. Bryan v. Commissioner, 209 Fed. (2d) 822, affirming Memorandum Opinion of this Court [10 TCM 987]. An effort was made to show that petitioner was a poor, uneducated negro without knowledge of bookkeeping or income tax matters; that he relied upon the skill and ability of his bookkeeper; and, therefore, there was no bad faith or intent to defraud on his part. The evidence shows petitioner was intelligent enough to handle several businesses successfully, including the illegal bolita business, and the illegal Cuba lottery business. The records kept by the bookkeeper appeared to be no more than a single entry system whereby petitioner would fill out *104 a sheet showing his cash receipts and expenditures and bring the sheet to the bookkeeper's office at his convenience, where the information thereon would be recorded in books. These books, together with other information which petitioner would relate orally to his bookkeeper at the end of the year, was the basis for the statements and figures appearing in the income tax returns. It is apparent that petitioner's reliance upon his bookkeeper amounted to little more than reliance upon him to record, as receipts and expenditures for most of his businesses, the amounts petitioner furnished and as to the gambling businesses, merely his statements of daily wins and losses and commissions paid. The above discussion will also serve as the basis for our finding that the returns filed by petitioner individually for the years 1944 and 1946, and jointly with his wife for the years 1943 and 1945, were false or fraudulent returns with intent to evade tax, and hence those years were not barred by the statute of limitations. Section 276(a). Decision will be entered under Rule 50. Footnotes
1. All section references are to the Internal Revenue Code of 1939.↩